246 S.W.3d 426 (2007)
In the Matter of the ADOPTION OF A.M.C., A Minor.
Paul Vick, Appellant,
v.
Dennis and Lois Cecil, Appellees.
No. 06-820.
Supreme Court of Arkansas.
January 4, 2007.
*427 Kennard K. Helton, Dardanelle, for appellant.
Kenneth A. Hodges, Russellville, for appellees.
ANNABELLE CLINTON IMBER, Justice.
This is a case involving the adoption of A.M.C., a minor child, who is the natural daughter of Appellant Paul Vick and Appellee Lois Cecil. Paul and Lois were formerly married, and Lois is currently married to Appellee Dennis Cecil. On appeal, Paul challenges the entry of an order granting the adoption of A.M.C. by Dennis. *428 He raises three points of error: (1) the circuit court erred in declining to apply the Indian Child Welfare Act of 1978 ("ICWA"), codified at 25 U.S.C.A. §§ 1901 through 1963 (2006); (2) the court erred in finding that he had abandoned A.M.C., which finding formed the basis of the court's determination that Paul's consent to the adoption was not necessary; and (3) the court erred in finding that the adoption was in the minor child's best interest. We affirm the judgment of the circuit court.
Paul and Lois were divorced by a final judgment and decree filed in the Thomas County Superior Court of the State of Georgia on May 23, 2002. The decree awarded joint custody and control of A.M.C. to Paul and Lois. The decree also incorporated a settlement agreement providing that Lois be the primary physical custodian of A.M.C. and that Paul pay child support to Lois in the amount of $80 per week and $40 per week during times of extended visitation. At the time of the divorce, Lois and the child were living in Arkansas.
From the date of the divorce, May 23, 2002, until July 16, 2004, Paul made thirteen child support payments totaling $1,140. He maintained regular contact with A.M.C. by telephone and was able to exercise extended visitation during the summer of 2002 and Christmas of 2002. In May 2003, Paul was arrested in Georgia on a felony methamphetamine charge and incarcerated in the county jail for three months. Then, upon his conviction, Paul was transferred to the penitentiary where he remained incarcerated until May 3, 2004. During his term of imprisonment, Paul communicated with A.M.C. by mail and phone.
Upon release from the penitentiary, Paul immediately contacted Lois in an effort to exercise summer visitation with A.M.C. She refused his request and four days later, on May 7, 2004, Dennis and Lois filed a petition to adopt A.M.C. The petition alleged that Paul's consent to the adoption was not required because "he has never paid child support and has not seen the minor child in over two (2) years." Sometime that same month, Lois changed her telephone number and denied Paul and his mother, Shirley Fradee, contact with A.M.C. because Lois "did not want them calling, harassing."
On July 24, 2004, Marian S. McCormick, the Principal Chief of The Lower Muskogee Creek Tribe, sent the circuit judge a letter in which she expressed the tribe's objection to the adoption. Paul filed an objection to Dennis and Lois's petition for adoption on July 28, 2004, alleging that Lois had changed her telephone number, failed to notify him of A.M.C.'s current address, and denied him the right to exercise visitation in the summer of 2004. Paul also asserted that he and A.M.C. are of American Indian descent and members of The Lower Muskogee Creek Tribe. Finally, he claimed to have made regular child support payments until he lost his job in October 2002 and got into trouble with the law. Child support records introduced at trial without objection confirm that Paul made no child-support payments between October 18, 2002, and May 21, 2004.
One year after Dennis and Lois filed the petition, Paul filed a motion to register foreign judgment and a motion to enforce visitation. The circuit court went forward with the adoption hearing on September 21, 2005, but, in view of its concern about the ramifications if the child had the requisite Indian ancestry, the court requested trial briefs on the issue of whether the ICWA should be applied in this case. Ultimately, the circuit court entered a decree, concluding that the ICWA did not apply to the case, that Paul's consent to the adoption was not required in that he *429 failed to pay child support for a period in excess of one year, and that the adoption was in the best interest of the minor child. From that judgment, Paul now appeals. This appeal involves an issue of first impression; thus, our jurisdiction is proper pursuant to Ark. Sup.Ct. R. 1-2(b)(1) (2006).
The appellate court reviews issues of statutory construction de novo, as it is for the appellate court to decide what a statute means; the court is not bound by the circuit court's decision; however, in the absence of a showing that the circuit court erred, its interpretation will be accepted as correct on appeal. In re Adoption of S.C.D., 358 Ark. 51, 186 S.W.3d 225 (2004).
Adoption statutes are strictly construed, and a person who wishes to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence. In re Adoption of Lybrand, 329 Ark. 163, 946 S.W.2d 946 (1997); In re Adoption of K.F.H. and K.F.H., 311 Ark. 416, 844 S.W.2d 343 (1993). A circuit court's finding that consent is unnecessary because of a failure to support or communicate with the child will not be reversed unless clearly erroneous. In re Adoption of K.F.H. and K.F.H., supra.
1. The Indian Child Welfare Act
For his first point on appeal, Paul argues that the circuit court erred when it went forward with the adoption proceedings in light of an objection interposed by The Lower Muskogee Creek Tribe. Specifically, Paul asserts that the circuit court should not have granted the adoption of an Indian child without the consent of the Tribe and without the clear proof required by the Indian Child Welfare Act.
The ICWA, was enacted to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." 25 U.S.C.A. § 1902 (2006). Congress noted in the Act that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe." 25 U.S.C.A. § 1901 (2006). The Act also provides "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." 25 U.S.C.A. § 1902.
As support for his argument on this point, Paul cites the following provision of the ICWA, 25 U.S.C.A. § 1912(f) (2006), which states:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
25 U.S.C.A. § 1912(f) (2006).
In order to decide whether the ICWA applies to the instant case, we must first determine whether the proceeding is a "child custody proceeding" as defined by the ICWA. 25 U.S.C.A. § 1903(1)(2006). Once that determination is made, we must ascertain whether the child is an "Indian child" as defined by the ICWA. 25 U.S.C.A. § 1903(4). That determination ultimately depends upon whether the Indian child is a member of a federally recognized tribe. 25 U.S.C.A. § 1903(8). See *430 In re A.D.L., 169 N.C.App. 701, 612 S.E.2d 639 (2005).
There is no dispute that the adoption proceeding at issue here is included within the definition of a "child custody proceeding" under the ICWA; that is, it involves an "adoptive placement" defined as "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." 25 U.S.C.A. § 1903(1)(iv). Yet, A.M.C. does not come within the ICWA's definition of an "Indian child." An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe" 25 U.S.C.A. § 1903(4). The ICWA defines "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians, including any Alaska Native village as defined [by statute]." 25 U.S.C.A. § 1903(8).
While it is undisputed that A.M.C. is a registered member of The Lower Muskogee Creek Tribe of Georgia, the Tribe is not federally recognized as eligible to receive services from the United States Bureau of Indian Affairs ("BIA"). See 70 Fed.Reg. 71194-71198 (Nov. 25, 2005). Furthermore, as far back as January 29, 1981, the BIA recommended that the Tribe not be acknowledged as an Indian tribe entitled to a government-to-government relationship with the United States. See 46 Fed.Reg. 51652-05 (notice given of determination that the Tribe does not exist as an Indian Tribe within the meaning of federal law (October 21, 1981)). Thus, there was no evidence to support a finding that A.M.C. is an "Indian child" under the ICWA.
We therefore hold that the circuit court correctly ruled that the ICWA does not apply to this adoption proceeding because A.M.C. is neither eligible for membership nor a member of a federally-recognized tribe. In other words, The Lower Muskogee Creek Tribe is not an "Indian tribe" as defined in the ICWA. Consequently, the circuit court was not required to hear expert testimony pursuant to 25 U.S.C.A. § 1912(f).
Despite the Tribe's lack of federal recognition, Paul points out that The Lower Muskogee Creek Tribe is recognized by the State of Georgia. See Ga.Code Ann. § 44-12-300 (1993). In an alternative argument, Paul relies upon other Arkansas statutes to support his proposition that Arkansas law relating to custody must give way to the desires and traditions of Indian tribes recognized by other states, as well as the federal government. In that regard, he makes specific reference to certain statutory provisions in the Arkansas Uniform Child-Custody Jurisdiction and Enforcement Act, codified at Ark.Code Ann. §§ 9-19-101 through 9-19-401 (Repl. 2002; 2005):
Ark.Code Ann. § 9-19-104, which provides, in part, the following:
(a) A child-custody proceeding that pertains to an Indian child as defined in the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq., is not subject to this chapter to the extent that it is governed by the Indian Child Welfare Act.
(b) A court of this state shall treat a tribe as if it were a state of the United States for the purposes of applying subchapters 1 and 2 of this chapter.
Ark.Code Ann. § 9-19-102(16) that defines "Tribe" to mean
[A]n Indian tribe or band, or Alaskan Native village, which is recognized by *431 federal law or formally acknowledged by a state.
He also points to Ark.Code Ann. § 28-73-103(18), part of the Arkansas Trust Code, where "an Indian tribe or band recognized by federal law or formally acknowledged by a state" is included within the Trust Code's definition of "State." Similarly, the term "State" includes "an Indian Tribe" in the Uniform Interstate Family Support Act, codified at Ark.Code Ann. §§ 9-17-101 through 902 (Repl.2002). See Ark. Code Ann. § 9-17-101(19)(i).
Paul's alternative argument is without merit. The Arkansas General Assembly has expressly indicated that the statutory definitions in each chapter only apply in the context of that particular chapter  Chapter 19 of Title 9 (The Arkansas Uniform Child-Custody Jurisdiction and Enforcement Act); Chapter 73 of Title 28 (The Arkansas Trust Code); and Chapter 17 of Title 9 (The Uniform Interstate Family Support Act). See Ark.Code Ann. §§ 28-73-103, 9-19-102, and 9-17-101. Moreover, Ark.Code Ann. § 9-19-104(a) clearly states that the provisions of the ICWA govern when a proceeding "pertains to an Indian child as defined in the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq.,. . . ." (emphasis added). Thus, according to Arkansas law, the provisions of the ICWA, including the proof required under 25 U.S.C.1912(f), only apply if the proceeding involves a child who is an "Indian child" as defined in the ICWA. See also State v. Klamath Tribe, 170 Or.App. 106, 116, 11 P.3d 701, 707 (2000) ("For purposes of ICWA, only Congress can define who is an Indian child."); cf. Mississippi Choctaw Indian Band v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (explaining that, unless Congress has clearly expressed its intent that an ICWA term be given content by the application of state law, the Court will presume that Congress did not so intend). In short, the General Assembly has not specifically adopted the requirements of the Indian Child Welfare Act. See Baker Refrigeration Sys., Inc. v. Weiss, 360 Ark. 388, 201 S.W.3d 900 (2005).
2. Consent to adoption
For his second point on appeal, Paul argues that the circuit court erred in finding that he had abandoned A.M.C., thereby making it unnecessary for him to consent to the adoption. Specifically, Paul asserts that the circuit court's findings were not supported by the evidence and were a misapplication of the law.
Pursuant to Ark.Code Ann. § 9-9-207(a)(2) (Supp.2005) of the Arkansas Revised Uniform Adoption Act, consent to adoption is not required of a parent whose child is in the custody of another if "the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree." Similarly, "Abandonment" is defined in the Act as
[T]he failure of the parent to provide reasonable support and to maintain regular contact with the child through statement or contact, when the failure is accompanied by an intention on the part of the parent to permit the condition to continue for an indefinite period in the future, and failure to support or maintain regular contact with the child without justifiable cause for a period of one (1) year shall constitute a rebuttable presumption of abandonment.
Ark.Code Ann. § 9-9-207(7) (Repl.2002).
Our court noted in In re Adoption of Lybrand, 329 Ark. 163, 169, 946 S.W.2d 946, 949 (1997), that "[t]he `abandonment' definition overlaps a bit with the language in § 207(a)(2). Under both provisions, the *432 question is whether the periods of non-communication or non-support resulted `without just cause' or were `justifiable.'" Also important to note is that the one-year period may be any one-year period, not merely the one-year period preceding the filing of the petition for adoption. Pender v. McKee, 266 Ark. 18, 582 S.W.2d 929 (1979). Furthermore, it is not required that a parent fail "totally" in these obligations in order to fail "significantly" within the meaning of the statutes. Id. The duty to support is not excused on the basis of other people's conduct unless such conduct prevents the performance of the duty of support. Id.
Our analysis must now turn to whether the circuit court's finding of abandonment without justification was clearly erroneous. In re Adoption of K.F.H. and K.F.H, 311 Ark. 416, 844 S.W.2d 343 (1993). We view the issue of justifiable cause as factual and, thus, one that largely is determined on the basis of the credibility of the witnesses. Id. This court gives great weight to a trial judge's personal observations when the welfare of young children is involved. Id.
In the instant case, we cannot say that the circuit court erred in holding that Paul had failed significantly, without justifiable cause, to support A.M.C. We have said that
The parent must furnish the support and maintenance himself and the duty is a personal one, and he may not rely upon assurance that someone else is properly supporting and maintaining the child to avoid the impact of the statute's providing for adoption of his child without his consent because of his failure to support the child.
Pender v. McKee, 266 Ark. 18, 31, 582 S.W.2d 929, 935 (1979).
The evidence is undisputed that Paul did not pay child support from October 18, 2002, until May 21, 2004, which is obviously more than one year. His delinquent child-support payments totaled $11,800. Although Paul kept in contact with A.M.C. during the period of his incarceration, our law is very clear that failure to pay child support for the requisite time period constitutes abandonment under sections 9-9-202(7) and 9-9-207(a)(2). Certainly a large part of the delinquent support accumulated when Paul was incarcerated for felony methamphetamine possession. While incarceration is not, of itself, conclusive on the termination issue, imprisonment does not toll a parent's responsibilities toward his or her children. Linker-Flores v. Arkansas Dep't. of Human Services, 364 Ark. 224, 217 S.W.3d 107 (2005)(citing Malone v. Arkansas Dep't of Human Services, 71 Ark.App. 441, 30 S.W.3d 758 (2000)). Applying the principles of Pender v. McKee, supra, the duty to support is not excused on the basis of other people's conduct unless such conduct prevents the performance of the duty of support. In other words, the fact that Lois changed her telephone number did not excuse or prevent Paul from making child-support payments. Even after his release from prison, Paul made no child-support payments between July 16, 2004, and the date of the hearing in September 2005.[1] Furthermore, testimony elicited at trial showed that Paul paid $700 to an attorney in Georgia in connection with the filing of a contempt motion against Lois.
Based on the record before us, we cannot say that the circuit court erred in holding that Paul's consent to the adoption *433 was not required under Ark.Code Ann. § 9-9-207 because he had failed significantly, without justifiable cause, to support A.M.C. for a period of one (1) year. Accordingly, we affirm on this point.
3. Best Interest of the Child
For his third and final point on appeal, Paul argues that the best interest of A.M.C. will not be served by granting the adoption and severing her relationship with him and his family. As stated earlier, the circuit court correctly determined that Paul's consent was not required. Before an adoption petition can be granted, the circuit court must further find from clear and convincing evidence that the adoption is in the best interest of the child. Dixon v. Dixon, 286 Ark. 128, 689 S.W.2d 556 (1985). We will not reverse a circuit court's decision regarding the best interest of a child to be adopted unless it is clearly against the preponderance of the evidence, giving due regard to the opportunity and superior position of the circuit court to judge the credibility of the witness. In re Adoption of Lybrand, supra.
In the instant case, Paul testified that prior to seeing A.M.C. in September 2005 at the hearing, he had not physically seen A.M.C. since 2002. There was also testimony that A.M.C. refers to Dennis as "Daddy," and that she refers to Paul as "Daddy Paul." Dennis testified (1) that he is willing to support A.M.C. in the event that he and Lois should divorce; (2) that he has worked as a carpenter for four years; (3) that A.M.C. has her own bedroom at their home; and (4) he understands the responsibilities associated with adopting A.M.C. Lois stated that Dennis is "[t]he best dad that you could ask for" and that Dennis does "everything" with A.M.C. In other testimony, Paul admitted that he had "roughly" five or six felonies, including kidnaping, aggravated assault, theft of a motor vehicle, theft by receiving, and fencing property, although the methamphetamine conviction was the only trouble he had been in within the past twenty years. At the hearing, Paul stated he was unemployed and lived with his mother, but he offered to give up his bedroom in order for A.M.C. to have her own room.
The circuit court determined that the adoption of A.M.C. by Dennis and Lois was in the best interest of the child. Specifically, the circuit court determined that "[Dennis and Lois] are morally fit to have the custody of the child and are physically and financially able to furnish suitable support, nurture, and education for the child and furthermore desire to establish the relationship of parents and child with aforesaid child."
Based on the record before us and giving due regard to the opportunity and superior position of the circuit court to judge the credibility of the witnesses, it cannot be said that the circuit court's findings were clearly against the preponderance of the evidence.
Affirmed.
DANIELSON, J., not participating.
NOTES
[1] There was testimony elicited at trial that Paul "may have paid $150 in there somewhere," but no record exists of that payment.